STATE OF NEBRASKA, APPELLEE, v. JOHN EDWARD RUST, ALSO KNOWN AS JOHN DEWITT, APPELLANT.

388 N.W.2d 483

Filed June 13, 1986.    No. 85-377.

Emil M. Fabian and Barbara Thielen of Taylor, Fabian, Thielen & Thielen, for appellant.

Robert M. Spire, Attorney General, and Melvin K. Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

Defendant-appellant, John Edward Rust, was adjudged guilty of, among other crimes, felony murder and sentenced to death. On direct appeal this court affirmed that judgment and sentence. *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), *cert. denied* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198, *reh'g*

*denied* 434 U.S. 988, 98 S. Ct. 622, 54 L. Ed. 2d 485 (*Rust I*). Rust thereafter moved for relief under the provisions of the Postconviction Act, Neb. Rev. Stat. §§ 29-3001 through 29-3004 (Reissue 1985). That motion was denied in *State v. Rust*, 208 Neb. 320, 303 N.W.2d 490 (1981), *cert. denied* 454 U.S. 882, 102 S. Ct. 368, 70 L. Ed. 2d 194 (*Rust II*). Apparently at the suggestion of the U.S. District Court for the District of Nebraska, Rust filed this second postconviction action seeking a vacation of the aforesaid judgment and sentence and a discharge from custody. He was again denied relief by the court below, and this appeal resulted. We affirm.

The evidence in this proceeding centered around three matters: the nature of the relationship between one of the jurors and trial counsel for Rust's codefendant, Ronald Ell; a claimed improper contact between a juror and Rust's trial counsel during the trial; and the claimed ineffective assistance of Rust's trial counsel and counsel in the direct appeal.

On the first matter, Rust contends that the friendship of juror Dan Corcoran and Ell's trial attorney, Jon Jabenis, caused Corcoran to favor Ell, to Rust's detriment. Following the trial of Rust and Ell, the court reporter serving the division of the district court for Douglas County over which Judge Caniglia presided, Lois Thompson, became interested in writing a book about the proceedings and contacted both Rust and Ell for that purpose. She agreed with Rust that she would inform him should she discover any information favorable to him. Judge Caniglia stated on the record that while he was aware that Thompson was to write a book, he was unaware of the disclosure provision and would not have given permission for Thompson to write the book had he known of it.

Thompson testified that as part of her research she talked with Corcoran and tape-recorded the interview but was unable to locate the tape; she had used the handwritten notes she had also taken during the interview to refresh her memory.

According to Thompson, Corcoran told her that he knew both Jabenis and Don Breit, Rust's trial attorney. However, he knew Jabenis better, as he had attended law school with him for 1 year and had maintained a good relationship with Jabenis after Corcoran quit law school. Corcoran knew this was

Jabenis' first capital murder case, and Corcoran wanted Jabenis to win it. The first vote by the jury on Ell was 11 to 1 for conviction, with Corcoran being the lone dissenter. During the interview, Corcoran took credit for eventually getting the vote down to 7 to 5 in favor of conviction. A mistrial was ultimately declared as to Ell, which irritated Corcoran because he felt Jabenis had won Ell's case. On the other hand, the jury quickly found Rust to be guilty.

Corcoran, according to Thompson, became nervous and on guard when questioned about the fact that he had been under oath during the voir dire examination, yet said he knew no one associated with the trial. Corcoran simply commented that he had to get on the jury because it was Jabenis' first capital case, one Jabenis just had to win.

Corcoran, on the other hand, testified that he had never established any type of friendship with Jabenis and merely knew him by sight and that that fact did not affect his jury deliberations. He did not remember seeing Jabenis from the time he quit law school until the time of the trial. Corcoran admitted he did not mention during the voir dire examination that he had attended law school and that he replied in the negative when asked whether he knew the two defendants or their two attorneys. He explained that he simply did not feel those matters were important enough to mention. Corcoran did, however, inform the court of others whom he only knew by sight. Corcoran further denied telling Thompson that Jabenis just had to win his first capital murder case or that he, the lone dissenter on the first vote on Ell, was able to convince four others to ultimately vote not guilty.

Jabenis testified that he did not know Corcoran at all in law school and that he had not become acquainted with him before the trial.

On the second matter, Thompson testified that she saw Corcoran talking to Breit outside the courtroom during a trial recess. According to her, Corcoran asked if "he could talk to his lawyer"; she replied that she did not talk to jurors but that she would get the bailiff, Frank Cominoli. Cominoli and Corcoran then had a conversation, which Thompson could not hear, after which Corcoran left the jury room and talked to Breit. All

Thompson heard of the conversation between Corcoran and Breit was Corcoran asking, "Who's going to take care of this when you're gone on Friday?" Later, Thompson learned that Breit had left the state. This was the only contact she observed between Breit and Corcoran. She did not report the matter to Judge Caniglia at the time, thinking it was the bailiff's responsibility; she did, however, discuss it with Judge Caniglia "way afterwards."

Cominoli testified he did not recall any jurors requesting to talk to anyone or anyone requesting to talk to a juror.

Robert Craig, an attorney who sat next to Corcoran in many classes during his first year at law school and maintained a friendship with him afterwards, testified he did talk to Corcoran at the Douglas County Hall of Justice while Corcoran was serving as a juror. Both Corcoran and Craig were on the board of directors of the Seventh Step Foundation, a nonprofit organization which assists ex-offenders, and Craig went to the Hall of Justice to get Corcoran's signature on an agreement for the foundation. Craig could not recall talking to anyone other than Corcoran at the time and was "99.9 percent" sure that the trial was not discussed during this meeting, although the trial and Jabenis' performance were discussed by the two after the trial. Corcoran also stated that the trial was not discussed during this meeting.

Jabenis testified that he was also aware of the fact that Corcoran had left the jury room momentarily to sign some papers for Craig.

On the third matter, the evidence centered around whether Breit had effectively represented Rust at trial and whether Rust was effectively represented by the Douglas County public defender and associated counsel on direct appeal. The evidence relating to these claims can be addressed more meaningfully in the following analysis of Rust's first assignment of error.

In that assignment Rust urges that the court below erred in failing to find that he was "denied effective assistance of counsel at both the trial and appellate levels." The claim that Rust was denied the effective assistance of counsel at trial was considered and rejected in his first effort to obtain postconviction relief. *Rust II*.

In an effort to prevent justice from being appealed to extinction under the provisions of the Postconviction Act, we have held that once a motion for postconviction relief has been judicially determined, any subsequent motion for such relief from the same conviction and sentence may be dismissed unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time of the filing of the prior motion. § 29-3001; *State v. Ohler*, 219 Neb. 840, 366 N.W.2d 771 (1985); *State v. Williams*, 218 Neb. 618, 358 N.W.2d 195 (1984); *State v. Pope*, 218 Neb. 361, 355 N.W.2d 216 (1984). Moreover, postconviction relief may not be used to secure a review of issues which were capable of being raised in a direct appeal. *State v. Hurlburt*, 221 Neb. 364, 377 N.W.2d 108 (1985).

The specified assignment, therefore, cannot be considered again.

The argument Rust actually makes in connection with this assignment, however, can be interpreted to be that the attorney representing him on his first postconviction motion, *Rust II*, was ineffective in that he failed to raise matters which should have been raised as trial errors. Obviously, a claim that Rust was denied the effective assistance of counsel in *Rust II* would not have been available at that time because it would be the efforts of the very attorney representing him in *Rust II* which would be questioned. See *State v. Ohler, supra*. Indeed, many of the assignments of error which follow were capable of being raised either in *Rust I* or *Rust II*; to the extent that is so, we interpret them to claim that Rust was denied the effective assistance of counsel in *Rust II*. Even so interpreting the first assignment, however, it, as we shall see, fails.

Rust claims Breit failed to do a number of things in connection with the trial which he should have done and did a number of things he should not have done. Specifically, he claims Breit

failed to make an opening statement; failed to impeach witnesses on inconsistencies; failed to take defendant to the scene of the shooting; failed to depose witnesses after the court ruled, permitting depositions to be taken; untimely filed his pretrial motions; failed to discuss trial

strategy with defendant; failed to argue that the felony robbery had terminated before the shooting; failed to notify the court that defendant was dissatisfied with trial counsel; failed to move for a mistrial on voir dire of jurors; failure to review police reports; failed to prepare for trial; failure to renew motion to sever after opening statements; failed to move for a mistrial after evidence of defendant's use of an alias was introduced, after evidence that weapon used in the robbery was stolen was introduced; failed to determine whether an insanity defense existed; failed to poll the jury; failure to prepare his own motion for new trial; failed to attend the hearing regarding sentencing ground rules; failed to discuss sentencing strategy with defendant; failed to introduce mitigating factors at the sentencing hearing other than those enumerated in the statutes; failed to review presentence investigation report; failed to inform sentencing court that state had discussed possibility of a plea bargain; failed to call to the court's attention that the prosecution had proven only two aggravating circumstances when, in its sentencing order, the court found there were four aggravating circumstances; failure to offer evidence in the form of a letter from South Dakota state's attorney concerning co-defendant Ell's violent tendencies; failed to point out to sentencing court that its fact interpretation of the shooting incident was incorrect; failed to prepare and argue effectively at the sentencing hearing; failed to present oral argument on the defendant's motion for a new trial; failed to adequately pursue and develop possible plea bargains and failed to keep the defendant advised of possible plea bargains.

Brief for Appellant at 11 and 12.

The difficulty with the claim from Rust's point of view is that even if we assume, as we do for the purpose of this analysis, that each of the foregoing claims has been established and that such proves Breit did not perform at least as well as an Omaha area lawyer with ordinary training and skill in the criminal law, *State v. Grotzky*, 222 Neb. 39, 382 N.W.2d 20 (1986), the claim nonetheless is without merit. That is so because Rust bears the

additional burden of showing that he was prejudiced by Breit's acts and failures to act. *State v. Hochstein*, 216 Neb. 515, 344 N.W.2d 469 (1984).

The record simply fails to show that if any of the claimed errors had not occurred, the outcome would have been different. With specific reference to plea arrangements, the record not only fails to show that any plea bargain was offered by the State but fails to show what, if any, plea bargain Rust would have accepted. He testified that he "always thought that felony murder thing was wrong" and made it quite clear he was not interested in pleading to the charge against him. Beyond that, there is no showing that the court would have honored any sentence which might have been agreed upon between the State and Rust.

In addition, Rust complains that on direct appeal it was not argued that the felony murder statute, Neb. Rev. Stat. § 28-401 (Reissue 1964), now Neb. Rev. Stat. § 28-303(2) (Reissue 1985), does not apply to the murder involved, and, further, that the statute is unconstitutional.

The first of these claims is based on the notion that the felony had ended before the killing took place. That, too, is a matter previously presented and rejected, *Rust II*, and therefore not available as an issue in this proceeding.

The matter of the constitutionality of the felony murder statute merges with assignment of error 5, and we therefore defer the analysis thereof until we reach that point.

This, then, brings us to Rust's second assignment. In that connection he claims the court below erred in failing to find he "was not entitled to and denied a meaningful comparative review of the death sentence imposed."

Rust recognizes that *Rust II* rejected the notion that he was entitled to the comparative review mandated by Neb. Rev. Stat. § 29-2521.03 (Reissue 1985). He argues, however, that *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372, has changed the law. Specifically, he refers to the following language appearing in the opinion of two judges of this court:

Under the provisions of 1978 Neb. Laws, L.B. 711, codified as part of chapter 29, article 25 (Reissue 1978),

this court must conduct its own review to determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in cases with the same or similar circumstances. We now construe § 29-2521.03 to require an extensive review and analysis of all first degree murder convictions for offenses committed on or after April 20, 1973, including cases presently pending in this court on appeal.

*Id.* at 230, 344 N.W.2d at 448.

How that language can be said to support Rust's argument defies understanding. *Rust II* rests the denial of statutory comparative review on the fact that the Rust judgment became final before § 29-2521.03 was enacted. The murders in *Reeves* took place after § 29-2521.03 was enacted. This case and *Reeves* therefore obviously present entirely different matters. The comparative review required by § 29-2521.03 does not apply to a death sentence which was imposed and became final prior to the effective date of the statute. *State v. Holtan*, 205 Neb. 314, 287 N.W.2d 671 (1980), *cert. denied* 449 U.S. 891, 101 S. Ct. 250, 66 L. Ed. 2d 117. There is no merit to Rust's position in this respect.

The third assignment of error contends the court below erred in failing to find Rust "was denied a trial by a fair and impartial jury due to juror bias and misconduct."

In this connection Rust urges, in summary, that the evidence detailed earlier concerning Corcoran's relationship with Jabenis, the former's desire to help the latter prevail on behalf of Ell, and Corcoran's contacts with Craig and Breit during the trial voids the jury's verdict.

It is unquestionably true that a jury in a criminal case must be free from external causes tending to disturb the exercise of its deliberate and unbiased judgment. *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979). Yet, in order for jury misconduct to become the basis for a new trial, it must be prejudicial. *State v. West*, 217 Neb. 389, 350 N.W.2d 512 (1984).

Even if we attribute to Corcoran all that Thompson attributes to him, the only thing that has been established is that Corcoran sought to help Ell's cause.

Rust argues in effect, however, that the very effort to help Ell

necessarily injured him. The evidence does not support such a conclusion. It is true that Rust was convicted and that the jury could not reach a verdict as to Ell, *State v. Ell*, 196 Neb. 800, 246 N.W.2d 594 (1976), but the trial evidence against Rust was overwhelming. During the chase which ensued almost immediately after the robbery, Rust was seen firing at the police cruisers, two of which were struck. After the automobile in which Rust and Ell were fleeing got stuck in a snowbank, both Ell and Rust left on foot. Ell hid in some bushes and surrendered when ordered to do so. Rust, on the other hand, continued to fire, killing a civilian who had come to the aid of the police, severely wounding one officer, and slightly wounding another officer. *State v. Ell, supra*; *Rust I.*

Such misconduct as may have occurred on the part of Corcoran, if any, did not prejudice Rust and therefore cannot become the basis for vacating the judgment or sentence.

In reliance upon *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), in which a sharply divided U.S. Supreme Court held that a psychiatric examination conducted in the absence of *Miranda* warnings to determine the defendant's competency to stand trial could not be used at the sentencing phase of the trial, Rust asserts in his fourth assignment of error that the court below erred in failing to find that he "was denied his Fifth Amendment right against self-incrimination in that he was not advised of his <u>Miranda</u> rights prior to the presentence investigation."

The facts in this case, however, do not present the issue raised by this assignment. While Rust's brief is silent as to the contents of the presentence report, a study of that report reveals that Rust said nothing which might adversely affect his sentence. While he may have provided general background information concerning his identity; residences; military, educational, and employment history; financial, health, and marital status; and lack of religious preference, with respect to his version of what occurred the report states: "He appeared to be cooperating during the interview but refused to make a statement because, he said, 'everything is in the police reports or the court record.' "

Under that circumstance the issue is a fictitious one, and any

discussion would be entirely academic and inappropriate, for it is not the function of this court to render advisory opinions. *Mullendore v. School Dist. No. 1, ante* p. 28, 388 N.W.2d 93 (1986); *State v. Hochstetler*, 214 Neb. 482, 334 N.W.2d 455 (1983). In this connection counsel are admonished that presenting a fictitious issue neither serves a client's interests nor brings honor to counsel.

In his fifth assignment Rust asserts error in the failure to "find the felony murder statute under which Appellant was convicted and sentenced (§29-401 Neb. Rev. Stat.) violative of the Eighth Amendment in that it makes possible a sentence of death for a killing committed without proof of premeditation, deliberation or intent to kill." This, then, ties into the argument left unresolved in our earlier analysis of the first assignment of error.

Rust posits that the felony murder statute inflicts "cruel and unusual" punishment by subjecting one to death for an unpremeditated, nondeliberate, and nonpurposeful killing.

Although it appears we have not addressed this precise issue previously, we recently, in *State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982), upheld the statute against a claim it was unconstitutional because it conclusively presumes the intent to kill, an essential element of the crime of murder. We pointed out that no specific intention is required to constitute felony murder other than the intent to do the act which constitutes the felony in question. In other words, the intent necessary to the crime of murder is constructively imputed through the intent to commit the underlying felony. See, also, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372; *State v. Hubbard*, 211 Neb. 531, 319 N.W.2d 116 (1982).

Rust argues that the U.S. Supreme Court's decision in *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), casts doubt on the constitutionality of felony murder statutes. We do not so read that case. *Enmund* held only that the death penalty cannot be imposed on one who aids and abets a felony in the course of which a murder is committed by others, but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force be employed. As

noted earlier, the trial evidence is that such is not the situation before us.

It is well established that a legislative body is not required to select the least severe penalty possible for a crime, so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. Moreover, a heavy burden rests on those who would attack and displace the judgment of the representatives of the people concerning determinations of what punishment fits a particular crime. *State v. Michalski*, 221 Neb. 380, 377 N.W.2d 510 (1985); *State v. Ruzicka*, 218 Neb. 594, 357 N.W.2d 457 (1984); *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

It cannot be said that our Legislature acted outside the bounds of the eighth amendment to the U.S. Constitution when it determined that one who kills in the perpetration of a felony might thereby subject himself or herself to the death penalty.

In his sixth assignment of error Rust asserts the court below erred in failing to find his "sentence of death excessive and disproportionate to the sentence of life imprisonment imposed on his co-defendant, Ronald Ell, who confessed to the actual killing."

It is important to note first of all that Ell did not claim he did the actual killing until after he had been convicted and sentenced to life imprisonment, and therefore risked nothing by so doing. As established previously, the evidence at the trials resulting in the conviction of Rust, *Rust I*, and in the later conviction of Ell, *State v. Ell*, 196 Neb. 800, 246 N.W.2d 594 (1976), was that Rust had done the actual killing. Under the circumstances it is not required that anyone believe Ell's postsentence claim in this regard.

Moreover, the matter of the purportedly disproportionate sentence imposed on Rust was considered and resolved adversely to him in both *Rust I* and *Rust II*; it is therefore not available in this proceeding and bears no further discussion. The Postconviction Act cannot be used to secure a further review of issues already litigated. *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984).

In the seventh assignment of error Rust complains of the failure to find that "the presentence investigation was

improperly admitted and considered by the sentencing panel in that §29-2519 et seq., entitled 'Special Procedures in Cases of Homicide', and §28-401 Neb. Rev. Stat. did not provide for the preparation, review and consideration of a pre-sentence investigation following a conviction for felony murder."

In this connection Rust argues in essence that the special procedures set out in Neb. Rev. Stat. §§ 29-2519 through 29-2524 (Reissue 1985) do not refer to presentence reports and therefore do not permit their use when considering sentences in homicide cases. This argument has been considered previously by this court and rejected. *State v. Reeves, supra; State v. Williams, supra.* See, also, *State v. Anderson and Hochstein,* 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981). No more need be said other than that we adhere to our prior determinations.

The eighth assignment of error complains of the failure of the court below "to find the use of the pre-sentence investigation, together with all other documentary evidence reviewed and considered by the sentencing panel, violative of the Confrontation Clause of the Sixth Amendment."

Rust places heavy reliance upon *Bullington v. Missouri,* 451 U.S. 430, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981), and *Arizona v. Rumsey,* 467 U.S. 203, 104 S. Ct. 2305, 81 L. Ed. 2d 164 (1984), in arguing that a criminal defendant has a right to confront all persons who give information used in a presentence report. We do not read those cases to stand for that proposition. While those cases acknowledge that criminal defendants are entitled to certain constitutional rights at the sentencing phase of a trial and hold that under the circumstances presented the double jeopardy clause prevented the imposition of the death penalty after the initial imposition of a life sentence, they do not concern themselves with the use of presentence reports. *Williams v. New York,* 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), specifically approved the use of presentence reports, in the following language:

> Modern changes in the treatment of offenders make it more necessary now than a century ago for observance of the distinctions in the evidential procedure in the trial and sentencing processes. For indeterminate sentences and

probation have resulted in an increase in the discretionary powers exercised in fixing punishments. In general, these modern changes have not resulted in making the lot of offenders harder. On the contrary a strong motivating force for the changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship. This belief to a large extent has been justified.

Under the practice of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information. To deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation. We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination. And the modern probation report draws on information concerning every aspect of a defendant's life. The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination. Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

The considerations we have set out admonish us against treating the due process clause as a uniform command that courts throughout the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence. New York criminal statutes set wide limits for maximum and minimum sentences. Under New York statutes a state judge cannot escape his grave

responsibility of fixing sentence. In determining whether a defendant shall receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice.

It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention. Leaving a sentencing judge free to avail himself of out-of-court information in making such a fateful choice of sentences does secure to him a broad discretionary power, one susceptible of abuse. But in considering whether a rigid constitutional barrier should be created, it must be remembered that there is possibility of abuse wherever a judge must choose between life imprisonment and death. And it is conceded that no federal constitutional objection would have been possible if the judge here had sentenced appellant to death because appellant's trial manner impressed the judge that appellant was a bad risk for society, or if the judge had sentenced him to death giving no reason at all. We cannot say that the due process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence.

337 U.S. at 248-52.

As noted in our earlier analysis of Rust's fourth assignment of error, the courts of this state, when considering matters related to sentencing, are not limited by the evidentiary rules applicable to a criminal trial. We have previously rejected the argument that the right of confrontation attaches to capital sentencing proceedings. *State v. Williams*, 217 Neb. 539, 352

N.W.2d 538 (1984). There is, therefore, no merit to this assignment of error.

Rust's next two assignments of error are interrelated and controlled by the same analysis. The ninth assignment attributes error to the failure of the court below to find that "it was constitutionally reversible error for the sentencing panel to consider Appellant's juvenile record in connection with aggravating circumstance 1(a) and mitigating circumstance 2(a), when the sentencing panel had previously ruled, after objection by defense counsel, that Appellant's juvenile conviction would not be admitted or considered." The 10th assignment ascribes error to the failure to find that "it was reversible error for the sentencing panel to consider Appellant's juvenile, petit larceny and speeding convictions, in that said convictions were not offered by certified copy."

Aggravating circumstance (1)(a) of § 29-2523 is defined as: "The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity." Mitigating circumstance (2)(a) of § 29-2523 is defined as: "The offender has no significant history of prior criminal activity."

Rust concedes in his brief that his convictions for assault and grand larceny in South Dakota were properly admitted before the sentencing panel. The only offense relied upon by this court in the direct appeal as supporting the sentencing panel's finding that aggravating circumstance (1)(a) is present was the South Dakota conviction of assault with the intent to inflict great bodily harm. *Rust I.* As to mitigating circumstance (2)(a), the sentencing panel, as previously noted, properly had before it a record of two prior convictions. Consequently, that mitigating circumstance cannot be said to be present. *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982).

Hence, any error in these respects, if such exists, is harmless and cannot be the basis for vacating the judgment or sentence.

The next three assignments also interconnect and are governed by the same principles. They are assignments 11, 12, and 13, which claim, respectively, that the court below erred in failing to find that "Appellant was denied his right to a trial by a

jury representing a true cross-section of the community"; "the 'death qualification' of Appellant's jury during voir-dire examination denied the Appellant a trial by a jury representative of a true cross-section of the community and created a jury that was conviction prone"; and "it was constitutional error for the trial judge to excuse a prospective juror simply because that jury [sic] expressed some concern about the death penalty."

Without expressly so stating, Rust in effect asks us to declare unconstitutional Neb. Rev. Stat. § 29-2006(3) (Reissue 1985), which provides that a prospective juror may be challenged for cause if that person's "opinions are such as to preclude him from finding the accused guilty of an offense punishable with death." Rust's thesis is that the exclusion of such persons from jury service on capital cases violates the right under the 6th and 14th amendments to the U.S. Constitution to a jury composed of a cross-sectional representation of his or her community at the guilt-innocence trial phase, in that such exclusion, he claims, produces a conviction-prone jury.

Specifically, Rust objects to the fact that a venirewoman was excused for cause by Judge Caniglia following a voir dire examination at which she disclosed she had read about the case and had encountered the victim's funeral procession and thought she might be influenced by what she saw and read. She also said the reinstatement of the death penalty "bothered" her. Judge Caniglia did not disclose his reason for excusing the venirewoman at the time, but in his memorandum in this proceeding finds that the venirewoman was excused because of her views on the death penalty, thereby impliedly finding that she held views on capital punishment which would substantially impair the performance of her duties as a juror.

In *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984), and *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372, this court, in reliance upon *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), held that it was permissible to exclude from jury service those who, because of scruples against the death penalty, would be unable to return a verdict of guilty regardless of the evidence. Subsequently, the

U.S. Supreme Court, in *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), ruled that it was proper to remove for cause a prospective juror whose views on capital punishment were such as to prevent or substantially impair the performance of his or her duties as a juror. Most recently, the U.S. Supreme Court, in *Lockhart v. McCree*, 476 U.S. _____, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), held a prospective juror may be removed for cause prior to the guilt-innocence phase of a bifurcated capital trial if his or her opposition to the death penalty is such that it would prevent or substantially impair the performance of his or her duties at the sentencing phase of the trial.

There is, therefore, no merit to these assignments of error.

In his 14th assignment Rust urges the court below erred in "failing to find that the exercise of prosecutorial discretion in other first degree murder cases in Nebraska denied the Appellant those rights guaranteed under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution."

To the extent Rust argues in this connection that the comparative review mandated by § 29-2521.03 establishes that his death sentence is disproportionate and therefore not appropriate, the matter has been treated and resolved against him in the earlier analysis of his second assignment of error.

In addition, however, Rust adduced evidence tending to establish that in some homicide cases, prosecutors, pursuant to agreement with counsel for the defense, withheld evidence of existing aggravating circumstances in order to assure that the death penalty would not be imposed.

He argues that the exercise of prosecutorial discretion in such a fashion renders the death penalty, whenever imposed, arbitrary and capricious as well as cruel and unusual, thereby violating the U.S. Constitution, as specified in the foregoing assignment of error. The evidence, however, falls far short of establishing that such agreements as the prosecutor made were discriminatory.

A prosecutor might well have made the agreements described for a nondiscriminatory reason; for example, because he or she considered the evidence concerning an essential element of the State's case weak, and therefore negotiated the punishment, to

the extent it was in the prosecutor's control to do so, to assure a conviction.

Consequently, Rust's evidence does not raise the issue he has assigned.

In his 15th and last assignment of error, Rust complains that Judge Caniglia failed "to disqualify himself from the proceedings."

In this connection Rust argues that Judge Caniglia's impartiality was suspect, as he was required to pass upon the credibility of the court reporter serving the division of the court over which he presided, had relied upon his own memory as to what the court reporter said about Corcoran's contact with another, and, further, commented that he would have withheld permission for her to write a book concerning the case had he been aware of the disclosure provision of her agreement with Rust.

In so arguing Rust relies primarily on *Tyler v. Swenson*, 427 F.2d 412 (8th Cir. 1970). Therein, the court ruled that as the judge at the postconviction hearing had weighed evidence involving his own recollection and observations, he should have disqualified himself. The judgment denying postconviction relief was therefore reversed and the cause remanded for a new hearing.

Again, however, this case does not reach the issue raised. Since the other errors assigned by Rust have been found to be without legal merit, it matters not whether Judge Caniglia abused his discretion in failing to disqualify himself. If he did err in that regard, the error did not prejudice Rust.

The judgment below is correct and is therefore affirmed.

AFFIRMED.