STATE OF NEBRASKA, APPELLEE, V. WESLEY H. PEERY, APPELLANT.
391 N.W.2d 566

Filed August 1, 1986.    No. 85-384.

Richard L. Schmeling, for appellant.

Robert M. Spire, Attorney General, and Melvin K. Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Following a jury trial, defendant, Wesley H. Peery, was adjudged guilty of murder in the first degree and the robbery of a coin shop. He was thereafter sentenced to death on the murder charge and to a consecutive sentence of not less than 16 nor more than 50 years on the robbery charge. Those convictions and sentences were affirmed by this court in *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), *cert. denied* 439 U.S. 882, 99 S. Ct. 220, 58 L. Ed. 2d 194 (1978) (*Peery I*). Thereafter, Peery filed a motion for a new trial based upon the discovery of evidence claimed to be new, the denial of which was affirmed in *State v. Peery*, 205 Neb. 271, 287 N.W.2d 71

(1980) (*Peery II*). Peery then filed a motion for postconviction relief, the denial of which was affirmed in *State v. Peery*, 208 Neb. 639, 305 N.W.2d 354 (1981), *cert. denied* 454 U.S. 882, 102 S. Ct. 369, 70 L. Ed. 2d 194 (*Peery III*). Following dismissal of Peery's action for relief in the U.S. District Court for the District of Nebraska in order that he might first exhaust his state remedies, he filed this second postconviction action seeking to vacate and set aside his "sentence and conviction." He was again denied relief by the district court, and this fourth appeal to this court was taken. For the reasons hereinafter discussed we affirm.

Peery assigns 20 errors to the denial of this latest motion. They, in summary, are that the postconviction court erred in (1) dismissing his motion; (2) failing to find that Neb. Rev. Stat. § 29-2006 (Reissue 1985), which provides that a juror can be excused for cause if his "opinions are such as to preclude him from finding the accused guilty of an offense punishable with death," unconstitutionally violates Peery's right to trial by a fair and impartial jury as guaranteed by article I, § 6, of the state Constitution and the sixth amendment to the federal Constitution; (3) finding that Peery had failed to prove "his diverse allegations with respect to the prosecution's challenges for cause and peremptory challenges"; (4) finding that all the excused venirepersons, with the exception of Epp, were excused for reasons unrelated to "death qualifying" the jury; (5) finding that the failure of Peery's trial counsel to cause the voir dire proceedings to be reported did not prejudice Peery in his challenge of the manner in which the jury was selected; (6) refusing to receive into evidence the trial attorneys' testimony and notes taken by them at the time of the selection of the jury concerning the attitudes of venirepersons Epp, Meisters, Philippi, and Sandell and alternate venireperson Joekel toward the death penalty; (7) failing to find that the prosecution exercised its cause and peremptory challenges so as to "death qualify" the jury, with the result that the jury was biased in favor of conviction, was not fair and impartial, and was not representative of a fair cross-section of the community; (8) finding that the testimony of Peery's expert witnesses concerning the relationship between one's attitude concerning

the death penalty and other attitudes relevant to the criminal justice system, such as the presumption of innocence, was irrelevant; (9) finding that the various studies regarding the conviction-proneness of "death-qualified" jurors and the "process effect" of the death qualification process as described in analyses by Craig Haney lacked quality and reliability, were not comparable to actual cases tried in Nebraska, and did not draw valid conclusions; (10) refusing to receive into evidence various studies concerning "death-qualified" juries; (11) refusing to receive into evidence various exhibits related to the above studies; (12) refusing to admit the notes taken by Peery's trial attorney, Stanley Cohen, concerning the jury selection; (13) determining that the "process effect" did not rise to constitutional dimensions and was therefore not a proper subject for postconviction relief; (14) finding that the "process effect" issue could have been raised on direct appeal, since the Haney analyses had not yet been performed; (15) concluding that the warrantless search of Peery's toolbox and the seizure of coins from inside it were constitutional; (16) finding that the identification of Peery by State witness Jacqueline Slack, nee Kuhn, was not impermissibly tainted by an identification encounter engineered by the State; (17) finding that the failure of Peery's trial attorneys to cause the voir dire proceedings to be recorded did not prejudice Peery; (18) failing to find that the other allegations regarding ineffective assistance of counsel contained in Peery's petition and motion for postconviction relief were true; (19) finding that the provisions of Neb. Rev. Stat. § 29-2521.03 (Reissue 1985) and related statutes are not retroactive and do not apply to Peery; and (20) rejecting Peery's various offers of proof.

The first assignment of error is simply a generalized conclusion based upon the specific errors claimed in Peery's other assignments. Because an analysis of the other assignments necessarily constitutes an analysis of this generalized conclusion, it requires no independent discussion.

Assignments of error 2 through 14, inclusive, 17, and 20 all deal with the selection of a "death-qualified" jury. These assignments fall into three broad categories. The first relates to Peery's constitutional challenge of the excusal for cause statute,

§ 29-2006(3). The second category centers around the "process effect" discussed in the Haney analyses and the effect upon jurors of various types of voir dire examinations discussed in the study made by Michael T. Nietzel and Ronald C. Dillehay. The final category relates to the postconviction court's finding that Peery failed to prove facts from which it can be concluded that any venirepersons were unconstitutionally excused because of their views on the death penalty and to the use made at his trial of both peremptory and cause challenges.

The assignment that § 29-2006(3) violates the sixth amendment to the U.S. Constitution and article I, § 6, of the Nebraska Constitution has been resolved adversely to Peery by the U.S. Supreme Court's decision in *Lockhart v. McCree*, 476 U.S. ____, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), and by our recent decision in *State v. Rust, ante* p. 150, 388 N.W.2d 483 (1986). See, also, *Darden v. Wainwright*, 477 U.S. ____, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). The statute constitutionally permits the removal for cause of a prospective juror whose views on capital punishment are such as to prevent or substantially impair the performance of his or her duties as a juror.

The second category of "death-qualification" assignments is predicated upon the fact that, over the objection of Peery's attorneys, the trial court permitted the voir dire examination of each venireperson to be conducted in the presence of other venirepersons.

In this connection Peery offered into evidence the studies authored by Haney and by Nietzel and Dillehay. The thesis of the Haney analyses is that the very process of identifying venirepersons with disqualifying attitudes against the death penalty during a voir dire examination conducted in the presence of other venirepersons produces a jury composed of persons with an increased belief in the guilt of the accused and with a belief that the law disapproves of those opposed to the death penalty. The Nietzel and Dillehay study expresses the thought that a completely individual, sequestered voir dire examination concerning a venireperson's death penalty views results in the elimination of a significantly greater percentage of jurors with biases against a criminal defendant than do other

types of voir dire examinations.

One of the Haney analyses offered in this case was relied upon by McCree in *Lockhart v. McCree, supra* at 1763 n.6. In that connection the U.S. Supreme Court observed that in oral argument McCree's counsel admitted that that matter, standing alone, would not give rise to a constitutional question. The general rule in this jurisdiction is that, in the selection of a jury, a party ordinarily has no right to examine a venireperson out of the presence of all other venirepersons. The only exception is when there is a showing that without sequestration a party's rights would be prejudiced. *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985).

Neither the Haney analyses nor the Nietzel and Dillehay study persuades us that Peery's right to a fair and impartial jury under the sixth amendment to the U.S. Constitution and article I, § 6, of the Nebraska Constitution was violated by the en masse voir dire examination conducted in this case. The Haney studies are flawed in a number of fundamental respects, including the manner in which the original sample was solicited and the fact that the studies do not analyze actual completed trials. The Nietzel and Dillehay study is also flawed in a number of fundamental respects, including the small size of the sample—13 capital cases in a single jurisdiction—and the fact that it does not take into account the effect of the variance in attorney skills. There is therefore no showing that Peery was in fact prejudiced by the method in which the voir dire examination was conducted.

The foregoing category of assignments, then, is resolved adversely to Peery by the rule that a conviction will not be set aside in the absence of a showing that an error created actual prejudice rather than merely the possibility of prejudice. *State v. Gregory*, 220 Neb. 778, 371 N.W.2d 754 (1985); *State v. Benzel, supra*.

The third and final category of "death-qualification" assignments also fails because the evidence does not satisfy Peery's burden of establishing a basis for relief. *State v. Galvan*, 222 Neb. 104, 382 N.W.2d 337 (1986); *State v. Brown*, 220 Neb. 305, 369 N.W.2d 639 (1985).

While the voir dire examination was not reported, the

minutes of the trial judge as recorded in the case reveal that, at most, two venirewomen were excused for cause by reason of their views concerning the death penalty. Venirewoman Epp indicated she could not find a defendant guilty knowing that the death penalty might be imposed. Venirewoman Sandell informed the court that she would require a greater amount of proof than if capital punishment were not involved, and could not follow the court's instructions with respect to the quantum of proof required.

The notes of one of Peery's trial attorneys reflected that there were three venirepersons opposed to the death penalty, but he could name only one who held such a view, venireman Heskett. This attorney also recalled, however, that Heskett nonetheless sat on the jury.

Peery's other trial attorney's notes also reflected that there had been three venirepersons who were opposed to the death penalty. He recalled that one such, venireperson Haskel, did, nonetheless, sit on the jury. It is noted, however, that no venireperson Haskel is listed on the clerk's jury list contained in the bill of exceptions.

The deputy county attorney participating in the trial recalled there were five venirepersons, Epp, Heskett, Joekel, Philippi, and Sandell, opposed to the death penalty. The prosecution exercised a peremptory challenge to prevent Joekel from sitting as an alternate juror.

The county attorney's notes reflected that there were four venirepersons opposed to the death penalty: Epp, Joekel, Philippi, and Sandell. Philippi, however, also had other reasons for being excused for cause.

While Peery complains that the postconviction judge refused to receive into evidence the notes of Peery's trial attorneys, it is obvious that all the participating attorneys were permitted to refer to their notes and to testify concerning their contents. Under that circumstance, error, if such there was, in refusing to admit any notes into evidence cannot have resulted in prejudice to Peery.

It is true that there are some variances in the recollections of the four attorneys participating in Peery's original trial relative to the number of venirepersons expressing concern over the

death penalty. Yet there is nothing from which it can be concluded that any venirepersons other than Epp and Sandell were excused for cause solely because of their death penalty views. The record establishes that Epp and Sandell were excused because their beliefs would prevent or substantially impair their performance as jurors. Once that has been determined, the various opinions expressed by Edward J. Bronson, Claudia L. Cowan, Phoebe C. Ellsworth, Robert Fitzgerald, Faye Goldberg, Joan C. Harrington, George L. Jurow, Gary B. Melton, William C. Thompson, W. Cody Wilson, Hans Zeisel, and others concerning the impact exclusion of such persons from jury service purportedly produces upon a jury's proneness to convict, even if valid, a matter we do not decide, become irrelevant. Neither do the Harris polls concerning public opinion relating to various aspects of the death penalty have any relevance to the issues in this case. Indeed, the vast majority of the foregoing opinions and studies were before the U.S. Supreme Court in *Lockhart v. McCree*, 476 U.S. ___, 106 S. Ct. 1758, 1762-63 nn. 4 and 5, 90 L. Ed. 2d 137 (1986). The dispositive reality is that the law permits exactly what was done with respect to the excusal for cause of venirewomen Epp and Sandell.

Neither does the evidence support the claim that the State used its peremptory challenges in such a manner as to deprive Peery of a fair and impartial jury. The testimony of his own attorneys establishes that at least one person who expressed concern over the death penalty was seated as a juror. The fact the State exercised a peremptory challenge to prevent one person with some concern about the death penalty from sitting as an alternate juror does not establish a deprivation of Peery's constitutional rights.

While *Lockhart v. McCree, supra*, did not deal with peremptory challenges, the U.S. Supreme Court nonetheless observed therein that "[a]dopting McCree's concept of jury impartiality would also likely require the elimination of peremptory challenges, which are commonly used by both the State and the defendant to attempt to produce a jury favorable to the challenger." *Id.* at 1767. The inference to be drawn from that language is that the U.S. Supreme Court does not view the

U.S. Constitution as doing away with peremptory challenges. It has been held that the use by a state of peremptory challenges to exclude from the jury members of the criminal defendant's race solely on racial grounds violates the equal protection rights of both the defendant and the excluded venirepersons. *Batson v. Kentucky*, 476 U.S. ____, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). That holding, however, does not prevent the use of peremptory challenges to exclude from a jury a venireperson who holds a point of view inimical to that espoused by the State. We do not read article I, § 6, of our Constitution to impose any greater restraint upon this state in this regard than does the U.S. Constitution.

This, then, brings us to the remaining four assignments of error: Nos. 15, 16, 18, and 19.

With respect to the first of these, Peery contends that the search of a toolbox he owned but kept locked at Mary Blazek's apartment was unconstitutional.

It must first be observed that this is an issue which clearly could have been raised in *Peery I*, the direct appeal from Peery's convictions and sentences. It is well established that a motion for postconviction relief may not be used to secure the review of an issue which was capable of being raised in a direct appeal. *State v. Rust, ante* p. 150, 388 N.W.2d 483 (1986). We nonetheless treat the matter as if raised as a part of Peery's claim that he had ineffective assistance of counsel.

The U.S. Supreme Court has held that a convicted defendant seeking a reversal of a conviction or death sentence on the basis that counsel's assistance was deficient must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. That Court defined a "reasonable probability" as a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

While articulating the criteria for evaluating the effectiveness of counsel in various ways, this court has applied the same standard by holding that an attorney has been ineffective in the defense of a criminal case only if his or her actions or inactions have so undermined the proper functioning of the adversarial

process that the trial cannot be relied upon as having produced a just result. In order to so establish, the evidence must show that the attorney failed to perform at least as well as an attorney with ordinary training and skill in the criminal law practicing in the community in which the trial is held and that his or her deficiencies have resulted in prejudice to the defendant. See, *State v. Rust, supra; State v. Lieberman,* 222 Neb. 95, 382 N.W.2d 330 (1986); *State v. Evans,* 218 Neb. 849, 359 N.W.2d 790 (1984).

With that background we are prepared to consider whether Peery's prior attorneys were ineffective by failing to raise the issue on direct appeal.

While Peery adamantly denied he ever gave the key which unlocked the box to the police, one of the police detectives testified that Peery had given it to him. The detective testified he told Peery that Blazek was locked out of her apartment, and asked that Peery give him his keys so that she could get in. Peery gave the detective his keyring, pointed out which key fit Blazek's apartment door, and said that none of the others fit anything in the apartment.

It is not clear whether Blazek was in fact locked out of her apartment; however, whether she was or was not is immaterial. We have previously held that deception by the police, standing alone, is insufficient to make an otherwise valid confession inadmissible. *State v. Erks,* 214 Neb. 302, 333 N.W.2d 776 (1983). In like manner, we hold that police deception which was not coercive in nature will not invalidate a consent to search if the record otherwise shows the consent to have been voluntary. *State v. Christofferson,* 101 Idaho 156, 610 P.2d 515 (1980); *State v. Hall,* 297 N.W.2d 80 (Iowa 1980), *cert. denied* 450 U.S. 927, 101 S. Ct. 1384, 67 L. Ed. 2d 359 (1981). If the police misrepresented Blazek's ability to get into her apartment, there was nothing coercive about the misrepresentation. There was nothing which prevented Peery from removing the Blazek apartment key from the ring and giving only that key to the police.

Thus, there is ample support for the trial judge's finding that Peery freely and voluntarily gave the key to the toolbox to the police. The voluntariness of a consent to search is a question of

fact and will not be disturbed on appeal unless clearly wrong. *State v. Garcia*, 216 Neb. 769, 345 N.W.2d 826 (1984); *State v. Horn*, 218 Neb. 524, 357 N.W.2d 437 (1984); *State v. Billups*, 209 Neb. 737, 311 N.W.2d 512 (1981).

Once it is found that Peery freely and voluntarily gave the toolbox key to the police, it cannot be said he thereafter retained a legitimate, that is to say, a reasonable, expectation of privacy to the contents of the box. Absent that expectation, there can have been no unreasonable search of the box. *State v. Havlat*, 222 Neb. 554, 385 N.W.2d 436 (1986); *State v. Searles*, 214 Neb. 849, 336 N.W.2d 571 (1983); *State v. Gonzalez*, 211 Neb. 697, 320 N.W.2d 107 (1982).

That being so, it cannot be concluded that Peery's prior attorneys were ineffective. Raising the issue would not have changed the result of the direct appeal.

The next assignment of error, that the in-court identification of Peery by witness Slack was tainted by an improper out-of-court encounter with him brought about by the actions of the State, is resolved by the rules that a postconviction motion cannot be used to secure a further review of issues already litigated and that a defendant will not be permitted to rephrase issues already presented. *State v. Rust, ante* p. 150, 388 N.W.2d 483 (1986); *State v. Hochstein*, 216 Neb. 515, 344 N.W.2d 469 (1984), *cert. denied* 469 U.S. 873, 105 S. Ct. 226, 83 L. Ed. 2d 156.

A review of Peery's brief in *Peery I* reveals that this same issue was raised and essentially the same argument made in connection with Peery's broad assignment of error that "[m]isconduct on the part of the prosecuting attorneys denied the defendant his constitutional right to a fair trial." Not only is the issue therefore not subject to relitigation but, as the evidentiary recitation in *Peery I* demonstrates, there was sufficient evidence without Slack's testimony to support Peery's conviction.

The 18th assignment broadly asserts that Peery's trial attorneys were ineffective. The claimed areas of ineffectiveness not previously commented upon focus principally on trial counsel's (1) failure to meet with Peery often enough before trial to inform him of the progress of the case and to allow him

to participate in his defense, (2) mischaracterization of Peery's murder conviction as a felony murder conviction in both a federal habeas corpus action and in *Peery III*, (3) failure to introduce any evidence of the nature or extent of the pretrial publicity, thereby effectively preventing Peery from presenting such at this late date, and (4) failure to interview potential witnesses suggested by Peery who would have presented favorable testimony on Peery's behalf.

The evidence fails to establish a reasonable probability that the result of the trial would have been different if the trial attorneys had spent more time with Peery, had not mischaracterized the nature of the murder conviction in a brief or pleading, had adduced evidence of the nature and extent of pretrial publicity, and had interviewed more witnesses. That being so, no prejudice to Peery has been shown, and, thus, there is no merit to the claim that Peery's trial attorneys were ineffective in these respects.

In the 19th and last assignment of error not previously considered, Peery in effect argues that the comparative review required by § 29-2521.03 and related statutes applies retroactively to the murder he committed. The argument is without merit. *State v. Rust, supra,* reaffirms the rule that § 29-2521.03 does not apply to a death sentence which, as is the situation in this case, was imposed and became final prior to the effective date of that statute.

Additionally, Peery argues that once this court determined in *Peery I* that an aggravating circumstance which the sentencing panel had applied was not present, it should have vacated his death sentence and remanded the matter to the sentencing panel for resentencing.

In reviewing anew the existence or lack of existence of aggravating and mitigating circumstances, this court in *Peery I* agreed with the sentencing panel's conclusion that no mitigating circumstances were present. However, this court disagreed with the sentencing panel's interpretation of the elements required for a finding that a murder is perpetrated for pecuniary gain (aggravating circumstance (1)(c), Neb. Rev. Stat. § 29-2523 (Reissue 1985)). As a consequence, this court ruled that three of

the four aggravating circumstances found by the sentencing panel existed.

It is on those facts that Peery bases his contention. However, Peery cites us to no authority which supports his argument. In fact, the authority is to the contrary. For example, *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), and *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), *cert. denied* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198, *reh'g denied* 434 U.S. 988, 98 S. Ct. 622, 54 L. Ed. 2d 485, involve murders wherein this court held that an aggravating circumstance found to exist by the sentencing judge or panel was not present. This court did not remand those cases for resentencing but, rather, modified the relevant sentence in *Stewart* and affirmed it in *Rust*. Peery's contention is without merit, as the three remaining aggravating circumstances warrant imposition of the death penalty.

The judgment dismissing Peery's motion for postconviction relief is correct and is therefore affirmed.

AFFIRMED.