STATE OF NEBRASKA, APPELLEE, V. HUDSON BIRD HEAD,
APPELLANT.
408 N.W.2d 309

Filed July 2, 1987.    No. 86-263.

James R. Wefso, for appellant.

Robert M. Spire, Attorney General, Melvin K. Kammerlohr, and William L. Howland, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

A jury found defendant-appellant, Hudson Bird Head, guilty of robbery in violation of Neb. Rev. Stat. § 28-324(1) (Reissue 1985), first degree sexual assault in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 1985), and first degree murder in violation of Neb. Rev. Stat. § 28-303(2) (Reissue 1985). He was adjudged accordingly and sentenced to imprisonment for a term of not less than 10 nor more than 15 years for the robbery, to a like term of imprisonment for the sexual assault, and to death for the murder.

By his original and supplemental briefs Bird Head assigns 14 errors, which combine to present 7 issues. The first asks (1) whether the trial judge erred in not disqualifying himself from the guilt and penalty determination phases of the proceeding. The next three issues relate solely to the guilt determination phase of the proceeding and ask (2) whether the trial judge erred in refusing a change of venue, (3) whether the trial judge erred in overruling defendant's motion to prohibit "death qualification" of the jury, and (4) whether the trial judge erred in considering the evidence sufficient to support each finding of guilt. For the reasons discussed in the remainder of this opinion, we answer each of the foregoing four inquiries in the negative and thus affirm each of the findings of guilt, as well as the sentences imposed for the robbery and sexual assault convictions.

The remaining three issues deal with the phase of the proceeding at which it was determined that the murder warranted imposition of the death penalty. One of these issues, (5), asks whether the sentencing panel erred in finding the presence beyond a reasonable doubt of certain statutory aggravating circumstances.

Because an error in the sentencing panel's determination that Bird Head had previously been convicted of crimes involving the use or threat of violence compels us to answer that inquiry in the affirmative, the remaining two issues need not be, and therefore are not, considered.

Accordingly, we reverse and vacate the sentence imposed for the murder conviction and remand the cause for further proceedings and resentencing in that regard.

## FACTS

In our review we are obligated to view the evidence most favorably to the State. *State v. Walker, ante* p. 794, 408 N.W.2d 294 (1987). So viewed, the evidence establishes that at 8:58 p.m. on March 2, 1985, State Trooper George Gleason received a radio call warning him of a possible drunk driver headed on the highway from Alliance to Bridgeport. Gleason then came upon a 1966 Chevrolet which matched the description of the automobile reported to him. The Chevrolet was traveling at 36 m.p.h. and was weaving from the shoulder of the highway to the centerline. Gleason stopped the automobile, which proved to have been operated by Bird Head, its only occupant. Gleason noted that Bird Head had glassy eyes and that there was a blue clutch purse and five beer cans on the floor of the automobile.

Bird Head could produce neither a driver's license nor an automobile registration document. After failing several field sobriety tests, Bird Head was told he would be taken to Bridgeport for further testing. When asked if he wanted the vehicle towed or left where it was, Bird Head indicated he wanted it left where it was because he could not afford to have it towed. However, because the automobile could not be locked, Gleason arranged to have it towed.

The Intoxilyzer test administered at Bridgeport revealed that Bird Head had .315 of 1 percent of alcohol in his blood. Bird

Head was given the *Miranda* warnings, after which he answered questions.

Bird Head told Gleason he had been drinking wine but denied being intoxicated. He also said he thought he had been driving a Ford and that he had been in Lincoln, driving through Gordon, on his way to Colorado. When asked to empty his pockets, Bird Head produced a number of items, including a pair of sunglasses, a black comb, 2 keys, some lottery tickets, 12 slices of individually wrapped Velveeta cheese, and $22.23. The money consisted of three $5 bills, six $1 bills, and $1.23 in coins. During the questioning, Gleason noticed bloodspots in the area of Bird Head's left knee. Sheriff Roger Sterkel also observed those spots, as well as a bloodspot on the left sleeve of Bird Head's sweater.

In accordance with standard procedure the automobile Bird Head had been driving was inventoried. As a result, there was found, in addition to the items noted earlier, a three-quarters full bottle of wine, some Cheetos, a Kentucky Fried Chicken box, a pair of eyeglasses in its case, and two crumpled $1 bills. The blue clutch purse contained documents issued to Mrs. Lillian Lynch and a $2 bill, which had been tucked into one of the pockets. In addition, the registration document found on the visor of the automobile showed that the automobile was registered to Mrs. Lynch.

Upon discovery of the registration and other identifying documents, Sheriff Sterkel attempted to telephone Mrs. Lynch at her home in Gordon but received no answer. Gleason then contacted Nebraska State Patrol Trooper Gary Boyer. Boyer arrived at Mrs. Lynch's home at approximately 11:39 p.m. and found it completely dark. He knocked on the door but received no response. He then went to the dining room window, shined his flashlight into the room, and saw that shoes and clothing had been strewn about. Boyer then discovered that the kitchen door was partially open, with a key hanging in its lock. He entered the house, turned on the dining room light, and saw what looked like a pair of nylon stockings in the hallway leading to the bedroom. He again saw the shoes he noticed when looking through the window and, in addition, saw a bloodstained brown handbag lying on the buffet. Boyer

proceeded to the bedroom and found it to be in disarray; a nightstand had been tipped over, dresser drawers had been opened, and the mattress had been pulled onto the floor. Boyer lifted the mattress and found Mrs. Lynch's corpse lying face down on the floor under the mattress. He then called for assistance.

Further examination of the scene revealed the presence of a number of items in addition to those first seen by Boyer, including a pair of pants in the dining room, a sweater, a pair of glasses, a denture plate, and a nosepiece from a pair of glasses. A bloodspotted nightcap was found under a nightstand in the bedroom, and a Velveeta cheese wrapper was found on the mattress.

A bloody cloth was wrapped twice around the 85-year-old victim's face, covering her eyes, nose, and mouth. A blood-covered knee supporter was found under the victim's blackened chin. The victim's arms were tied tightly behind her back, and she had been bound with what appeared to be a jump rope, a bathrobe tie, and a white undergarment. She was unclothed below the waist, and her feet were tied with a pair of nylon stockings, but spread apart.

The autopsy revealed that Mrs. Lynch suffered multiple injuries prior to her death. She had been struck in the mouth, as the result of which her lower lip was cut; a blow had been administered in the area of an eye; and she had cuts on the left side of her neck. There was also a cut on the victim's vaginal area resulting from its penetration by some appendage such as a finger or penis. Tests revealed the presence of acid phosphatase within the victim's vaginal tract, a finding consistent with the past presence of semen, a substance which deteriorates rapidly. The victim's vagina also contained a substance secreted by one having Bird Head's type of blood. That same substance was found in some white crusty spots of semen found on a rug near the victim's body. The spots also contained a substance found in persons having the same blood type as did the victim. Mrs. Lynch had also received a series of blunt traumas of the sort administered by a flat object such as an open hand, foot, or sole of a shoe or boot. The blunt trauma broke three of the victim's ribs, fractured her thyroid cartilage, or adam's apple, and

injured the back of her head. In a pathologist's opinion, it is likely that with timely and proper medical intervention Mrs. Lynch would have survived; leaving her unattended made death a certainty.

During the last morning of her life, Mrs. Lynch had deposited her Social Security check and taken $20 of it in cash. The bank teller testified that Mrs. Lynch always asked for small bills, so that it is likely the teller had given the victim three fives and five ones. On the same day Bird Head had attempted to sell some furniture to a local merchant.

The nosepiece found in Mrs. Lynch's house came from the glasses Bird Head produced from one of his pockets, and the victim often kept Velveeta cheese on hand. The lottery tickets found in Bird Head's possession were of the kind given to the victim by a supermarket at which she traded. Additionally, one of the keys found in Bird Head's pocket opened the side door to the victim's garage.

A single head hair was found on a rug in the victim's house, which had characteristics similar to Bird Head's hair. In addition, 23 hairs similar to Bird Head's hair were found in sweepings of Mrs. Lynch's house, and bloodstains found on Bird Head's clothing were made by blood of the same type as that of the victim.

At approximately 5 p.m. on the day of the murder, Bird Head had been seen drunk, leaning in the doorway of an office located at a distance of about an 8-minute walk from Mrs. Lynch's house. One of the victim's neighbors heard a "bang" at approximately 6 p.m. Later, the antenna to Mrs. Lynch's automobile was found lying on the ground near the garage. The unconsumed blood-pressure-controlling pill Mrs. Lynch should have taken at 6 p.m. was found at the scene. At 8:02 p.m. Bird Head purchased some chicken at the Kentucky Fried Chicken store in Alliance, a distance of 70.9 miles from the victim's house.

## ISSUES
### (1) Nondisqualification

We now turn our attention to the first issue, whether the refusal of Judge Empson to disqualify himself from presiding over the guilt phase of the trial and from participating in the

sentencing phase of the trial unconstitutionally denied Bird Head a fair trial and subjected him to cruel and unusual punishment.

Bird Head argues Judge Empson was disqualified from participating in this case because as a former county attorney, he had both filed misdemeanor complaints against Bird Head and had prosecuted Bird Head's brother Wendell, and that as a judge he had earlier presided over a trial in which Bird Head was convicted of a felony and over a trial in which Bird Head's brother Vernon was convicted of two felony offenses. Bird Head calls particular attention to the fact that when sentencing Bird Head's brother Vernon in 1982, Judge Empson said:

> I am probably not the only frustrated judge today in this very vicinity, maybe in the state of Nebraska, I don't know what to do with you. If I had it in my power I would turn you into a frog. You could not hurt anybody else anymore if I could do that; but I can't. The most I can do is put you out of circulation for as long as I can so that people's property, and in an occasion like this, their lives will be safe from you. I think you better count yourself lucky already that you didn't get a habitual criminal rap, which could have been done which is such a thing that is meant for a person like you, who simply will not learn.
>
> . . . .
>
> I will probably do this every time you see me, give you the maximum I can.

We begin our analysis of this issue by recalling some fundamental rules. The first of these is that a motion to disqualify a judge on the ground of bias or prejudice is addressed to the judge's sound discretion, and an order overruling such a motion will ordinarily be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *State v. Goodpasture*, 215 Neb. 341, 338 N.W.2d 446 (1983); *Kennedy v. Kennedy*, 205 Neb. 363, 287 N.W.2d 694 (1980); *State v. Davis*, 198 Neb. 823, 255 N.W.2d 434 (1977). Moreover, a party seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *State v. Gillette*, 218 Neb. 672, 357 N.W.2d 472 (1984).

More specifically, *State v. Burnside*, 185 Neb. 234, 175 N.W.2d 1 (1970), held that a judge who had previously prosecuted the defendant but had no recollection of either the defendant or his past record properly refused to disqualify himself. In ruling on the disqualification motion in this case, Judge Empson noted that he neither recognized Bird Head nor recalled very much about the old prosecutions of Bird Head and his brothers. Moreover, *State v. Davis, supra*, held that a judge was not disqualified because, as a prosecuting attorney, he indicated his intention to prosecute the defendant to the maximum extent for any future crime. We recognize that Judge Empson's expressed intention of imposing a maximum sentence each time he encountered Vernon Bird Head was made as a judge and that such circumstance distinguishes the "turn you into a frog" speech from that involved in *State v. Davis, supra*. The overriding fact, however, is that whatever the speech may portend for Vernon Bird Head, it was not directed at Bird Head himself. We have also held that a judge was not disqualified because he had earlier presided over another case involving one of the parties. *Liberty Finance Corp. v. Jones*, 184 Neb. 529, 169 N.W.2d 289 (1969). Judge Empson was not disqualified as a matter of law because he had previously encountered Bird Head or his brothers as a prosecutor and judge or because of anything he had said to Bird Head's brother Vernon.

Bird Head further argues, however, that the following statement made by Judge Empson in overruling the disqualification motion shows that he considered himself biased against Bird Head:

Well, knowing that I have done a number of silly things, and I will continue to do them, I am still smart enough to see what is in the wind here. I have read all these Motions, and I have listened to all the arguments of Counsel through all of these proceedings, and I have read the file, and I know that it is possible there may come a day when I may have to decide how to sentence Mr. Bird Head on a conviction of First Degree Murder. Because of that the temptation is very strong to grant this Motion, because you can't want to have to do that, there are a whole lot more pleasant things that I could be doing with my time.

And if I were in a court that had a number of other judges available, Lincoln or Omaha, or even a court that had another judge available on whom I could impose I would grant this Motion just out of hand. But we're in a different situation here. For the right of the Plaintiff to have a fair and speedy trial and the right of the Defendant to have a fair and speedy trial by a judge that is able to devote his time and attention to the case, then it is not so easy.

On the contrary, stripped to its essence the foregoing comment, although perhaps best left unexpressed, says only that while Judge Empson would prefer to do other things, he would nonetheless do his duty. The record fails to establish that Judge Empson's roles as the trial judge and as a member of the sentencing panel deprived Bird Head of any constitutional right or otherwise denied him a fair trial. Accordingly, there was no error in the trial judge's refusal to disqualify himself.

### (2) Venue

In arguing the second issue, that the trial judge erred in failing to grant a change of venue, Bird Head relies on evidence showing that the murder was given wide media coverage in the surrounding area and on an unscientific poll purporting to show that of the 45 persons questioned in the city of the trial, virtually everyone had heard about the killing and more than half had formed an opinion as to Bird Head's guilt. That evidence falls far short of establishing, as Bird Head claims, that he was unconstitutionally deprived of a trial by an impartial jury.

We recently reaffirmed the rule that under the provisions of Neb. Rev. Stat. § 29-1301.01 (Reissue 1985), a motion for a change of venue is addressed to the sound discretion of the trial judge and that the trial judge's ruling will not be disturbed absent a clear abuse of that discretion. The factors to be evaluated in determining whether a change of venue is required because of pretrial publicity include the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in selection of the

jury, the number of challenges exercised during the voir dire, the severity of the offenses charged, and the size of the area from which the venire is drawn. *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986).

The record in this case establishes that of the 68 venirepersons subjected to voir dire examination, the vast majority had heard of the case and many had views concerning Bird Head's guilt. The important fact, however, is that of those who had formed such views, only two said, in effect, that they could not put those views aside and decide the case on the basis of the evidence. Each of these two venirepersons was excused for cause.

The law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinion and render a verdict based on the evidence presented in court. *State v. Kern, supra; Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). The foregoing rule implements that portion of Neb. Rev. Stat. § 25-1636 (Reissue 1985) which reads:

> It shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of a crime with which a prisoner is charged, if such juror shall state on oath that it is the belief of said person that he or she can render an impartial verdict according to the law and the evidence; and the court shall be satisfied as to the truth of such statement . . . .

The cases relied upon by Bird Head from other jurisdictions which hold a change of venue should have been granted are inapposite. In *Fisher v. State*, 481 So. 2d 203 (Miss. 1985), the media coverage was far more extensive than that in this case and was inflammatory to the point it included a pretrial editorial pronouncement of Fisher's guilt. In *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985), the media coverage was not only both extensive and inflammatory, but the jury selected included persons who had known the victims and had attended their funeral. One of the jurors had known the victims for a period of 8 years and had worked with two of them.

Relying on *Fisher v. State, supra*, which stated that a motion for change of venue should be ruled upon before prospective

jurors are summoned, Bird Head further argues that it was improper for the trial judge to delay ruling on the change of venue motion until after the jury was selected. On the contrary, since the care exercised and the ease encountered in the selection of the jury and the number of challenges exercised during the voir dire are factors to be considered under Nebraska law in determining whether the venue should be changed, waiting until those factors can be experienced is entirely appropriate. See *State v. Kern, supra.* Indeed, the record establishes that notwithstanding the fact the trial judge was generous in excusing venirepersons from jury service, a jury was nonetheless selected with ease. There was no error in refusing a change of venue.

(3) "Death Qualification" of Jury

The third issue is whether it was error to excuse from jury service certain venirepersons because of their opposition to the death penalty. In essence, Bird Head argues that since the jurors do not impose the sentence, their views concerning the death penalty are immaterial, and to excuse from jury service those who are opposed to capital punishment unconstitutionally deprives him of a fair trial by subjecting him to a conviction-prone jury.

Neb. Rev. Stat. § 29-2006(3) (Reissue 1985) provides that it is good cause to challenge one called for jury service in a capital case if his or her opinions are such as to prevent "finding the accused guilty . . . ."

We have recently reviewed the applicable law in *State v. El-Tabech, ante* p. 395, 405 N.W.2d 585 (1987), and *State v. Burchett,* 224 Neb. 444, 399 N.W.2d 258 (1986), and reaffirmed the rule that a venireperson whose views on capital punishment are such as to prevent or substantially impair the performance of his or her duties as a juror may be constitutionally excused from jury service in a capital case. *State v. Peery,* 223 Neb. 556, 391 N.W.2d 566 (1986); *State v. Rust,* 223 Neb. 150, 388 N.W.2d 483 (1986); *Lockhart v. McCree,* 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986). No useful purpose would be served by reiterating the analyses which lead to this conclusion.

The record in this case reveals that of the venirepersons

subjected to voir dire examination, three were excused for cause because each said, in one way or another, that his or her views concerning the death penalty rendered it impossible to find Bird Head guilty. Those holding such views cannot perform their duties as jurors, and they were therefore properly excused from jury service in this case.

(4) Sufficiency of Evidence

In arguing the fourth issue Bird Head claims the evidence is insufficient to support the findings of guilt. That the evidence is circumstantial does not mean the State failed to prove its charges, for one may be convicted of a crime on the basis of such evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. *State v. El-Tabech, supra.* Moreover, it is not our function to weigh the evidence; a verdict of guilt must be affirmed if the evidence, viewed and construed most favorably to the State, sufficiently supports some rational theory of guilt. *State v. Walker, ante* p. 794, 408 N.W. 294 (1987).

The evidence overwhelmingly places Bird Head at the scene of the crimes. Among the more significant circumstances were the presence on Bird Head's clothing of bloodspots made by the same type of blood as that of the victim, the presence in Bird Head's pockets of cheese of the same type as that kept by Mrs. Lynch, the possession by Bird Head of a key fitting the victim's garage, the presence in the victim's house of a nosepiece from glasses found in Bird Head's possession, the presence of hairs similar to Bird Head's in the victim's home, the presence in the victim's body and in her home of a substance secreted by those of Bird Head's blood type, and Bird Head's presence near the victim's house on the day of the murder. Any one of the foregoing circumstances, standing alone, might be argued to be mere coincidence, but all of them together more than support beyond a reasonable doubt the conclusion that Bird Head was at the victim's house. Of course, that alone is not enough to prove Bird Head is guilty of any crime whatsoever. There is, however, much more.

(a) Robbery

When Bird Head was arrested, he was driving Mrs. Lynch's automobile. Her clutch purse was found on the floor of the

automobile. No money was found in it except for the $2 bill tucked into a pocket. Although earlier in the day Bird Head had been trying to raise money, upon his arrest he was found to have in his possession bills of a denomination likely obtained earlier in the day by the victim. Further, the clutch purse found in the automobile is of a type usually kept in a handbag and not carried separately; a circumstance which supports an inference that it was taken from the bloodstained brown handbag found on the buffet in Mrs. Lynch's home. The evidence unequivocally establishes that Mrs. Lynch was the victim of violence.

Neb. Rev. Stat. § 28-324 (Reissue 1985) provides that one commits robbery "if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever."

In *State v. Welchel*, 207 Neb. 337, 342-43, 299 N.W.2d 155, 159 (1980), this court stated:

> "The essence of [§ 28-324] is that the money or property must be in the possession or under the control of the victim and that violence or putting in fear was the means used by the robber to take it." As interpreted by this court, it is not necessary that the property be taken from the "person." It is sufficient if it is taken from the individual's personal presence, protection, or control. [Citation omitted.] . . .
>
> . . . "An essential element of the crime of robbery is that the theft be accomplished by the use of force, violence, or intimidation. [Citation omitted.] Force relied upon must be sufficient to effect a transfer of the property from the victim to the robber and if it is sufficient to overcome resistance, the degree is immaterial."

The evidence more than sufficiently fulfills the requirements of § 28-324 and supports beyond a reasonable doubt the conclusion that Bird Head robbed Mrs. Lynch.

(b) Sexual Assault

Neb. Rev. Stat. § 28-319(1) (Reissue 1985) provides in relevant part: "Any person who subjects another person to sexual penetration and (a) overcomes the victim by force . . . is guilty of sexual assault in the first degree."

The element of force, coupled with the presence of the

vaginal tear, the presence of a substance secreted by those having Bird Head's blood type in the victim's vaginal tract, and the pathologist's opinion that the victim was penetrated, more than adequately support beyond a reasonable doubt the conclusion that Bird Head was guilty of first degree sexual assault.

### (c) Murder

Neb. Rev. Stat. § 28-303(2) (Reissue 1985) provides that a person commits murder in the first degree if he or she kills another person "in the perpetration of or attempt to perpetrate any sexual assault in the first degree . . . [or] robbery . . . ."

Establishing the robbery and the first degree sexual assault inevitably leads to the conclusion that the evidence more than adequately supports beyond a reasonable doubt that Bird Head killed Mrs. Lynch while in the perpetration of a robbery and a first degree sexual assault, and thus murdered her in violation of § 28-303(2).

### (5) Aggravating Circumstances

A sentencing panel, consisting of the judge who presided over the trial and two others, was convened, pursuant to the provisions of Neb. Rev. Stat. § 29-2520 (Reissue 1985), to determine the penalty to be exacted for the murder.

In fulfilling its responsibilities in that regard, the panel undertook a consideration, among other things, of whether sufficient aggravating circumstances existed to justify the imposition of a sentence of death. Neb. Rev. Stat. § 29-2522 (Reissue 1985).

Neb. Rev. Stat. § 29-2523(1)(a) (Reissue 1985) specifies it is an aggravating circumstance that an "offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity . . . ."

In an effort to prove the existence of that aggravating circumstance, the State offered, and the court received over Bird Head's objection, those portions of the presentence report which reveal that prior to the crimes which are the subject of this appeal, Bird Head was convicted on two charges of assault in 1981 and of an attempted second degree assault in 1982. According to the report, Bird Head was sentenced to 1 year's

imprisonment at the Nebraska Penal and Correctional Complex on each of the aforesaid convictions. Reasoning that "the use or threat of violence to the person" was "[i]mplicit in [each of] those crimes," the sentencing panel unanimously found the existence of aggravating circumstance (1)(a).

Bird Head bases his contention on the fact the record does not show that he waived or had counsel on the occasions of the questioned convictions. He therefore urges that the receipt into evidence of those portions of the presentence report and the sentencing panel's reliance upon them violated his rights under the 6th and 14th amendments to the U.S. Constitution. We, however, need not, and therefore do not, reach this constitutional question because, in any event, there exists an error in the sentencing panel's determination that beyond a reasonable doubt aggravating circumstance (1)(a) exists. That circumstance requires that we set aside and vacate the finding in that regard and remand the matter for further proceedings and resentencing on the murder conviction.

The State elected not to adduce any evidence concerning the factual circumstances surrounding the assaults in question. We agree with the sentencing panel's conclusion that there are two aspects to aggravating circumstance (1)(a), one of which may be proved by establishing prior convictions for "another murder or crime involving the use or threat of violence to the person" and the other of which may be proved by showing that the offender "has a substantial history of serious assaultive or terrorizing criminal activity," irrespective of whether the offender was convicted for the conduct creating the history. We do not agree, however, that every assault conviction necessarily involves the type of "use or threat of violence to the person" contemplated by the first aspect of the aggravating circumstance. Given the fact the first aspect concerns itself with "murder" or another crime "involving the use or threat of violence to the person," we must conclude that the crime, other than murder, must be of a serious nature akin to the type of substantial history specified in the second aspect of the aggravating circumstance, that is, a crime which can be characterized as being "serious assaultive or terrorizing criminal activity."

Our statutes define three degrees of assault and range in seriousness from intentionally or knowingly causing another serious bodily injury to merely threatening one in a menacing manner. Neb. Rev. Stat. §§ 28-308, 28-309, and 28-310 (Reissue 1985). *In re Interest of Siebert*, 223 Neb. 454, 390 N.W.2d 522 (1986), for example, upheld an assault conviction where no blow was struck but a threat to injure was accompanied by simulated karatelike motions. While, to be sure, such behavior is not to be commended, it does not rise to the level of misconduct which should bear upon whether one's life is to be forfeited for a subsequent unrelated murder.

We therefore hold that, as a matter of law, merely showing that Bird Head had been convicted of two assaults of unknown degree and an attempted second degree assault without showing the factual circumstances surrounding those convictions does not establish the existence of aggravating circumstance (1)(a) beyond a reasonable doubt.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR RESENTENCING.