IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MASTERS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RUSTY K. MASTERS, APPELLANT.

Filed June 3, 2025.    No. A-24-440.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Keith Dornan, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Pursuant to a plea agreement, Rusty K. Masters pled guilty to attempted sexual assault of a child in the first degree. The Lancaster County District Court sentenced him to 40 to 50 years' imprisonment. On appeal, Masters contends the district court violated his due process right to a fair tribunal, denied him a meaningful allocution, and imposed an excessive sentence. He also argues that his trial counsel was ineffective in various ways. We affirm.

## II. BACKGROUND

On May 10, 2023, Masters was charged by information with sexual assault of a child in the first degree, a Class IB felony, in violation of Neb. Rev. Stat. § 28-319.01(2) (Reissue 2016). Pursuant to a plea agreement, Masters pled guilty on February 23, 2024, to an amended charge of

attempted sexual assault of a child in the first degree, a Class II felony, in violation of Neb. Rev. Stat. § 28-201(4)(a) (Reissue 2016) and § 28-319.01(2).

The plea hearing is not contained in our record; however, Masters' presentence investigation report (PSR) includes police reports that outline the facts underlying his conviction. In June 2022, Masters, then 32 years old, engaged in sexual activity with A.K., the 13-year-old sister of his 21-year-old girlfriend, Alexis K. A.K. disclosed the details of the incident during a medical examination at the Child Advocacy Center on March 2, 2023, and provided further information during a forensic interview conducted on March 21.

A.K. explained that prior to the encounter, she expressed to Alexis her desire to have sex. Alexis suggested that A.K. have sex with Masters, and later drove them from their home in Milford, Nebraska, to Masters' residence in Lincoln, Nebraska, where the sexual encounter took place. A.K. reported that during the encounter, all three individuals undressed and engaged in sexual activity. According to A.K., Alexis performed fellatio on Masters, after which Masters touched A.K.'s breasts, performed cunnilingus on her, and penetrated her vagina with his penis. A.K. stated that the sexual contact ended when Masters had penile-vaginal intercourse with Alexis. According to A.K., Alexis did not engage in sexual activity with her. Additionally, A.K. reported that Masters had sent her an explicit photo of his genitals prior to the sexual encounter.

Following the forensic interview, a recorded phone call was made between A.K. and Alexis. During the call, Alexis admitted to arranging the sexual encounter between Masters and A.K., and she confirmed that she had observed the event. Alexis stated that she arranged the encounter to ensure that A.K.'s first sexual experience occurred in a "controlled environment."

On March 3, 2023, investigators from the Lincoln Police Department's Special Victims Unit contacted both Masters and Alexis at Masters' residence. Both individuals agreed to be transported to the police station for questioning, where they waived their *Miranda* rights. Masters admitted to the details of the sexual encounter, acknowledging that he touched A.K.'s breasts, performed cunnilingus on her, and penetrated her vagina with his penis. He also mentioned a second encounter that occurred at his residence weeks later, in which A.K. performed fellatio on him, and he again penetrated her vagina with his penis. Masters further admitted to sending A.K. an explicit photo of his genitals and receiving nude photos from her.

During Alexis' interview, she confirmed her involvement in arranging the sexual encounter and being present during the activity, as described by both A.K. and Masters. After their interviews, both Masters and Alexis were arrested and taken into custody.

Sentencing took place on May 16, 2024. The district court sentenced Masters to 40 to 50 years' imprisonment with credit for 41 days previously served. His sentence was ordered to run consecutively to any other sentence being served by Masters. The court further found that Masters committed an aggravated offense under Neb. Rev. Stat. § 29-4001.01(1) (Reissue 2016) of the Sex Offender Registration Act (SORA). As a result, it found that he was subject to SORA's lifetime registration requirement pursuant to Neb. Rev. Stat. § 29-4005(1)(b)(iii) (Reissue 2016) and lifetime community supervision pursuant to Neb. Rev. Stat. § 83-174.03 (Reissue 2024).

Masters appeals.

## III. ASSIGNMENTS OF ERROR

Masters assigns that the district court erred in (1) violating his due process right to a "fair tribunal," (2) denying his "due process and statutory rights to give a meaningful allocution" prior to sentencing, and (3) imposing an excessive sentence. He also assigns that his trial counsel was ineffective by (4) failing to file a motion to recuse the sentencing judge on grounds that its impartiality might reasonably be questioned; (5) submitting a psychological evaluation that was detrimental to Masters without his informed consent; (6) failing to provide alternative medical and mental health records; (7) failing to inform him of his right to review the PSR or provide him a copy; (8) failing to review the PSR with him or inform him of its contents; and (9) failing to provide additions, corrections, and deletions to the PSR.

## IV. STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. RIGHT TO FAIR TRIBUNAL

Masters asserts that his due process right to a fair tribunal was violated "because the trial judge who sentenced [him] was also the prosecutor in [his] 2005 juvenile case that resulted in a conviction for criminal mischief." Brief for appellant at 17. He argues that the trial judge placed "undue weight" on his juvenile record "and other factors." *Id*. The State argues that Masters did not preserve this issue for appeal because he did not move for the trial judge's disqualification. We agree with the State.

The "Judges Notes" indicate that Masters first appeared before the sentencing judge in May 2023; sentencing did not occur until May 2024. Despite having the opportunity to do so, Masters did not seek the trial judge's disqualification prior to sentencing. A litigant waives the issue of judicial disqualification if it is not presented at the "'earliest practicable opportunity.'" *State v. Thomas*, 311 Neb. 989, 1000, 977 N.W.2d 258, 269 (2022) (quoting *State v. Buttercase*, 296 Neb. 304, 893 N.W.2d 430 (2017)). Because Masters failed to raise the issue of judicial disqualification at the earliest practicable opportunity, the issue is waived.

Further, as Masters acknowledges, a judge's prior prosecution of a defendant does not disqualify the judge as a matter of law from presiding over the defendant as a judge. See *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987). And as the State points out, there is nothing in the record that indicates the trial judge "actually recalled being involved in [Masters'] juvenile court proceeding from nearly 20 years earlier, or that she noticed the entry in the PSI." Brief for appellee at 17. A party seeking to disqualify a judge on the basis of bias or prejudice bears the

heavy burden of overcoming the presumption of judicial impartiality. *State v. Bird Head, supra*. There is nothing in the record before us to indicate any judicial impartiality.

## 2. DENIAL OF ALLOCUTION

Masters next asserts that he was denied his "due process and statutory right to give a meaningful allocution when the trial judge failed to give him an opportunity to refute the erroneous information relied on by the sentencing judge." Brief for appellant at 24. He acknowledges that he was afforded an opportunity to provide allocution but claims that it was "legally insufficient" because the trial court "refused to allow [him] to refute the erroneous information contained in the PSR." *Id*. The State once again argues that Masters failed to preserve this issue for appeal because he did not make a timely objection.

Allocution is an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. *State v. Pereira*, 284 Neb. 982, 824 N.W.2d 706 (2013). In Nebraska, allocution is statutorily required by Neb. Rev. Stat. § 29-2201 (Reissue 2016), which states, "Before the sentence is pronounced, the defendant must be informed by the court of the verdict . . . and asked whether he has anything to say why judgment should not be passed against him."

In *Pereira, supra*, the defendant made a similar claim that he was denied allocution. However, neither the defendant nor his counsel alerted the district court to any concern about the extent of allocution permitted to him. The Nebraska Supreme Court held:

> If [the defendant] or his counsel felt that [the defendant] was indeed being denied allocution, a timely objection would have alerted the court to that fact. Instead, the court was left with the impression that there was nothing more to be said. Generally, where no objection is made at a sentencing hearing when a defendant is provided an opportunity to do so, any claimed error is waived and is not preserved for appellate review. *State v. Svoboda*, 13 Neb. App. 266, 690 N.W.2d 821 (2005). Because the general rule has not been applied previously in the context of allocution at sentencing, we have addressed the allocution issue on its merits. In the future, however, we will apply the waiver rule where a defendant fails to make an objection after having the opportunity to do so.

*Id.* at 987-88, 824 N.W.2d at 711.

Here, as in *Pereira*, Masters was given an opportunity to speak before sentencing, thereby satisfying the statutory requirement of allocution. If Masters believed that this opportunity was inadequate, it was incumbent upon him to object and bring that concern to the district court's attention at that time. Instead, the following colloquy took place:

> THE COURT: Mr. Masters, any comments that you have regarding sentencing?
>
> [Masters]: Sentencing, no. I wish I could take back what I did. But I can't. If there was any kind of way of taking it back, I wish I could. It was my own stupidity. And all I can say is I'm sorry to [A.K.] and her family. And that's all I can say. I don't know what else to say at this point. It's my own stupidity that caused it. And I know some people forgive, some people don't. That's all I can say.
>
> THE COURT: Any comments from the State?

[The State made sentencing comments.]
THE COURT: Any legal reason [a] sentence cannot be imposed?
[Masters' Trial Counsel]: No, Your Honor.

The district court then made sentencing comments. Before imposing a sentence, the court once again asked if there was any legal reason a sentence could not be imposed. Masters' trial counsel responded, "No, Your Honor." The court proceeded to make additional sentencing comments and sentenced Masters to 40 to 50 years' imprisonment. Because the record reflects that no objection or request for additional allocution was made, we agree with the State that any claim of error regarding allocution is waived.

### 3. EXCESSIVE SENTENCE

The district court entered an order on May 16, 2024, sentencing Masters to 40 to 50 years' imprisonment for attempted sexual assault of a child in the first degree, a Class II felony, which is punishable by 1 to 50 years' imprisonment. See, § 28-201(4)(a); § 28-319.01; Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2024).

Masters claims that the district court abused its discretion in imposing an excessive sentence. He acknowledges that while his actions "were criminal and resulted in harm to A.K., the trial court abused its discretion by ignoring the mitigating factors present, and unfairly mischaracterizing his criminal history." Brief for appellant at 30.

Although Masters' sentence is at the high end of the sentencing range for a Class II felony, his sentence is within the statutory limits. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Masters' PSR reveals the following information. Masters did not complete high school, but he obtained a GED. Masters lived with his grandparents for over 7 years. He has been through two divorces and has a 10-year-old daughter. According to the PSR, he was required to pay $370 per month in child support and owed $32,753.29 in child support arrears. We note here that Masters argues in multiple places in his brief that the PSR did not accurately represent his child support situation.

A "Level of Service/Case Management Inventory" (LS/CMI) was conducted as part of the PSR. This instrument assesses the degree of risk the offender presents to the community and the likelihood of recidivism. Masters scored in the "very high" risk range for the antisocial pattern domain. He scored in the "high" risk range for the domains of family/marital, leisure/recreation,

and procriminal attitude. He scored in the "medium" risk range for the domains of criminal history, companions, and alcohol/drug problems. Overall, he scored 23 on the LS/CMI, placing him in the "high" risk category.

The "Vermont Assessment of Sex Offender Risk-2" (VASOR-2) and the "Sex Offender Treatment Intervention and Progress Scale" (SOTIPS) were also conducted as part of the PSR. The VASOR-2 assesses the degree of risk for sexual and violent recidivism and describes the severity of the offense. The SOTIPS evaluates risk, treatment, supervision needs, and progress among adult male sex offenders and can be used as part of a static and dynamic risk assessment in conjunction with the VASOR-2. Masters scored in the "moderate-low" risk range on the VASOR-2 and in the "high" risk range on the SOTIPS, with a combined score of "moderate-high."

Masters was also administered a "Standardized Risk Assessment Reporting Format" for substance abuse offenders. Due to his "criminal history, minimization of involvement in the current case, and his limited number of prosocial companions," he scored in the "high" risk range for recidivism.

A neuropsychological evaluation of Masters was conducted in October 2023 by Dr. Robert G. Arias. Dr. Arias concluded that Masters' results indicated a 100 percent chance of "noncredible performance . . . due to suboptimal effort/intent to perform poorly" and that his performance was considered "a dramatic underestimate of his true abilities." Dr. Arias further noted that there was "no valid data indicating any neuropsychological mitigation in [Masters'] behaviors leading to his legal charge[]." He also concluded that there was "no indication that [Masters] has difficulty with decision-making from a neuropsychological standpoint."

A factor favoring Masters is that he does not have an extensive criminal record. His record includes some juvenile offenses, for which he completed probation. His adult record consists of minor alcohol-related offenses, both of which were dismissed. The most serious offense in Masters' record is his conviction in this case.

On appeal, Masters contends that the district court "misrepresented [his] criminal history, unfairly denigrated his personal circumstances, and ignored any and all mitigating factors in sentencing him." Brief for appellant at 33. In particular, he argues that the court failed to consider the "undisputed evidence" that (1) having sex with A.K. "was not [his] idea," (2) he "initially and repeatedly refused to engage in sexual acts with A.K.," (3) he was "repeatedly groped and pursued by A.K. prior to the sexual encounter," and (4) he "took steps to avoid A.K." *Id.* at 35. He contends that these facts are "consistent with the statutory mitigation factors" and are "frankly, bizarre, and unlikely to be repeated." *Id*. "It took two people, [Alexis] and A.K., acting in concert over a period of weeks to convince [him] that having sex with A.K. was a good idea." *Id*. He suggests that "[t]hose are significant mitigating circumstances that the trial court ignored." *Id*.

The State points out that Masters admitted to sexually assaulting a 13-year-old child and that it happened twice. Further, there is nothing in the record to indicate that the district court failed to consider the relevant sentencing factors, including any mitigating circumstances, when imposing Masters' sentence. At sentencing, the court stated that it "reviewed" and "considered" Masters' PSR. It also stated that it "[took] into consideration all the statutory factors" required by law and analyzed those factors as they pertained to Masters. Notably, the court stated:

> You don't seem to grasp the gravity of this situation and the nature of this offense. Which is dangerous. Because if you don't get it and you don't understand why, you are a danger.

Then it's hard to be able to accept that you're not going to be a danger when you get out of prison.

Masters also argues that the district court "misrepresented [his] criminal history" by saying he has "a history of assaultive behavior." Brief for appellant at 33. Although Masters' criminal record does not include convictions for assault, the PSR does contain information related to assaultive behavior. The PSR reflects that Masters was suspended from school for fighting, and his neuropsychological evaluation indicates that he "has a history of many fights as a minor and in his 20s." In his post-*Miranda* interview, he also recalled an incident when he was younger where "[he] and a guy got into it and . . . ended up meeting in [a] parking lot." He stated that this incident was investigated for terroristic threats. The district court did not state that Masters had been adjudicated or convicted of assault, and the PSR supports its comment that Masters has "a history of assaultive behavior." Further, Masters had an opportunity prior to the imposition of his sentence to give further context to the information in the PSR but chose not to do so.

Masters also asserts that the district court placed "undue weight" on his neuropsychological evaluation. Brief for appellant at 34. While the court referenced the neuropsychological evaluation during sentencing, it was only one of several factors considered in determining an appropriate sentence. And because the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, a sentencing court is accorded very wide discretion in imposing a sentence. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). Therefore, we cannot say that the district court abused its discretion in considering Masters' neuropsychological evaluation and the weight it gave to that evaluation. *Id.*

Finally, Masters contends that he should have been afforded a more lenient sentence because he accepted responsibility for his actions. Although he was honest with investigators and showed remorse at the sentencing hearing, he has also blamed his actions on factors such as a lack of sleep and alcohol. In addition, his PSR indicates that he has a procriminal attitude/orientation. This is evidenced by his statement that he was doing A.K. "a favor by helping her out with what she wanted." And contrary to what Masters suggests, we do not believe the district court took this statement out of context considering the overall circumstances of the case.

Based on the record before us, we cannot say that the district court abused its discretion in imposing Masters' sentence.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

Masters has different counsel on direct appeal than he did in district court. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Once raised, the appellate court will determine whether the record on appeal is sufficient to review

the merits of the ineffective performance claims. *Id.* A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Lierman, supra.* Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *Blaha, supra.* To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under Strickland may be addressed in either order. *Id.*

Masters claims that his trial counsel provided ineffective assistance when counsel (1) failed to move for the trial judge's recusal on the grounds of judicial impartiality; (2) submitted a neuropsychological evaluation that was detrimental to him without his informed consent; (3) failed to provide alternative medical and mental health records; (4) failed to inform him of his right to review the PSR or provide him a copy; (5) failed to review the PSR with him or inform him of its contents; and (6) failed to provide additions, corrections, and deletions, to the PSR. As discussed next, the record is only sufficient to address his first claim; it is insufficient to review the other claims.

(a) Failure to Move for Trial Judge's Recusal

The record does not support Masters' claim that trial counsel's performance was deficient by failing to file a motion for judicial recusal, as such a motion likely would not have been successful. The Nebraska Revised Code of Judicial Conduct says that a judge "shall perform all duties of judicial office fairly and impartially." Neb. Rev. Code of Judicial Conduct § 5-302.2. It is a judge's duty to disqualify himself or herself whenever "the judge's impartiality might reasonably be questioned." Neb. Rev. Code of Judicial Conduct § 5-302.11(A).

"Impartial" means, in part, the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties." Neb. Rev. Code of Judicial Conduct, Terminology. When evaluating a trial judge's alleged bias, the question is whether a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023). In other words, the question is not simply whether someone could conceivably question a judge's impartiality. *Id.* It is presumed that all judges in this state carry out all of their duties competently and diligently. *Id.* One such duty is that judges have a responsibility

to "hear and decide matters assigned to the judge, except when disqualification is required." Neb. Rev. Code of Judicial Conduct § 5-302.7. In so doing, every judge "shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Neb. Rev. Code of Judicial Conduct § 5-302.2. Accordingly, a defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *Ezell, supra.*

In support of his claim for judicial disqualification, Masters asserts that the trial judge previously prosecuted him in a 2005 juvenile case for criminal mischief. However, the Nebraska Supreme Court has held that a trial judge is not disqualified as a matter of law because he or she had previously encountered the defendant as a prosecutor. See *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987) (trial judge not disqualified despite prior involvement with defendant and family as prosecutor where there was no indication of actual bias or prejudice). In this case, there is no indication that the trial judge's previous role as a prosecutor in Masters' 2005 juvenile case led to actual bias or prejudice in the present case. The only reference to the trial judge's involvement in Masters' 2005 juvenile case appears in the PSR, specifically within Masters' criminal history from the Lancaster County Attorney database. There, the trial judge is listed as the attorney in his 2005 case. Even assuming the trial judge served as the prosecutor, that alone is not grounds for disqualification.

There is nothing in the record showing that the trial judge remembered any involvement in Masters' 2005 case or that she even noticed her name in the PSR. Given the nearly 20-year gap and the large number of cases handled over that time, it is not reasonable to expect the judge to recall every former case or defendant. The record also does not show how involved the trial judge was in Masters' 2005 case.

Masters contends that the trial judge's bias is evidenced by comments she made during sentencing. The State disagrees, arguing that the trial judge's comments "were not inappropriate or even inaccurate according to the information provided . . . in the [PSR]." Brief for appellee at 28.

Masters first argues that the trial judge showed bias by saying he has "a history of assaultive behavior," which he claims was a mischaracterization of his criminal history. The judge stated:

> You have . . . not a very extensive record of criminal conduct on paper. It's not the worst that I have seen. But you do have a history of assaultive behavior. During your interview with law enforcement, you were quick to point out that you knew all the protocols for having your cell phone searched and giving a DNA sample. That you'd been through that before.

As previously discussed, the record supports the judge's statement that Masters has "a history of assaultive behavior." While Masters was never adjudicated or convicted of assault, the trial judge did not claim he was. There was no mischaracterization of Masters' criminal history.

Masters also claims that the trial judge showed bias by making "disparaging comments on [matters] unrelated to legitimate sentencing rationales" and by refusing "to recognize any mitigating circumstances or positive attributes of Masters." Brief for appellant at 40. The record does not support this claim. The trial judge discussed Masters' age, mentality, experience, social background, criminal record, record of law-abiding conduct, motivation for the offense, and nature

of the offense, all of which are among the factors a judge is permitted to consider. See *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The record also reflects that the judge considered mitigating circumstances, including Masters' limited criminal history, his head injuries, and the letters submitted by his character references. Masters has not overcome the presumption of judicial impartiality.

For these reasons, a motion for judicial recusal would likely have been unsuccessful, and trial counsel's performance was not deficient for failing to file such a motion. See *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020) (as matter of law, counsel is not ineffective for failing to make meritless objection). As such, this ineffective assistance of counsel claim fails.

### (b) Neuropsychological Evaluation

Masters claims trial counsel submitted the neuropsychological evaluation to probation "that was overwhelmingly detrimental to Masters." Brief for appellant at 41. He contends "[t]he evaluation contained no information that reflected positively on Masters," he was not provided a copy of the evaluation, "nor did he provide informed consent for it to be given to the court." *Id.* He suggests there is "not . . . one single iota of information contained in Dr. Arias' report that could have benefited [him] at sentencing." *Id.* at 43. Masters contends that there is no indication that Dr. Arias reviewed any of his medical records as part of the evaluation, and that he had "extensive medical records from multiple incidents where he suffered from a traumatic brain injury." *Id.* He argues that "[n]o effective defense attorney who reviewed Dr. Aria[s'] report would determine that it would be beneficial to their client if provided to the court." *Id.* Masters claims he was not informed of this decision, nor did he provide consent.

We agree with the State that because this claim requires an evaluation of matters not contained in the appellate record, the record is insufficient to review this claim on direct appeal; it is therefore preserved for postconviction review.

### (c) Medical and Mental Health Records

Masters claims that there were medical and mental health records that were available that "would have buttressed [his] contention that his injuries affected his mental state when he committed his crime." *Id.* at 46. He contends that trial counsel "either failed to procure these records or was provided records yet failed to submit them to the court." *Id.* He argues that "competent counsel would have provided alternative medical records documenting [his] history of traumatic brain injuries." *Id.*

Once again, we agree with the State that the "appellate record does not disclose if there was any information contained in those records that was not already in the PSI" and therefore "it is impossible to determine on direct appeal whether Masters was actually prejudiced by those records not being included in the PSI." Brief for appellee at 29. Accordingly, this claim is also preserved for postconviction review.

### (d) Right to Review PSR or Provide Copy

Masters claims his trial counsel "failed to inform him of his right to review the PSR" and "failed to provide [him] a copy." Brief for appellant at 48. He contends the PSR "contained erroneous information that the trial court relied upon in [its] sentencing rationale, thus prejudicing

[him]." *Id*. He argues that the PSR contained "erroneous information that [he] had failed to pay child support for many years." *Id*. When the district court addressed Masters' failure to pay child support, he was "obviously surprised to hear that" and he "immediately attempted to contest that factual issue." *Id*. Had trial counsel reviewed the PSR with him, Masters would have "pointed out this issue." *Id*. "Instead, the trial court concluded that Masters' position on child support was simply an example of his dishonesty." *Id*. He claims this led to the trial court relying on its perception of his dishonesty "to question his statement that he mistakenly sent a 'dick picture' to A.K." instead of his girlfriend. *Id.* at 49. Additionally, Masters believed that the PSR contained his medical and mental health documentation related to his traumatic brain injuries.

As acknowledged by the State, this claim is "based on private conversations between trial counsel and Masters that are not part of this record." Brief for appellee at 29. We are also unable to conclude on the present record whether there was erroneous information contained in the PSR related to Masters' child support obligation. Since the record is insufficient to review this claim on direct appeal, it is preserved for postconviction review.

### (e) Failure to Review PSR or Inform of Contents

Masters alleges that his trial counsel "did not adequately discuss or review" the PSR with him. Brief for appellant at 50. He claims this resulted in the district court relying on "erroneous information" in its "sentencing rationale." *Id*. When the court asked trial counsel if he had reviewed the PSR, trial counsel responded that he had and that he had discussed it with Masters. The court did not ask Masters directly whether he had reviewed the PSR or whether he had any corrections. Masters claims that trial counsel only "briefly mention[ed] the PSR to [him] mere minutes before he was sentenced." *Id*. "That communication was inadequate to inform [him] of the contents of the PSR, in particular the erroneous child support information, and the lack of medical and mental health records." *Id*.

Once again, as pointed out by the State, the "discussions between trial counsel and Masters are not contained in the record, so it is impossible to know on this record what they did or did not discuss." Brief for appellee at 30. Since the claim requires information not contained in the present record, we cannot review this claim on direct appeal. It is preserved for postconviction review.

### (f) Failure to Correct PSR

Masters claims that his trial counsel was "well aware that [he] was current with his child support" and that his payments "had gone unrecorded by the Nebraska Department of Health and Human Services." Brief for appellant at 51. He contends that he told his trial counsel that he provided child support payments directly to his ex-wife, "and that she was supposed to file receipts with the court." *Id*. He argues that there was an agreement between his ex-wife and himself through attorneys that Masters would make a one-time payment of $67,500 to his ex-wife "to cover the remainder of any future child support he owed." *Id*. He contends that his trial counsel, "despite being aware of the situation, said nothing." *Id*. at 52. As a result, "the trial judge commented unfavorably on [his] erroneous record of non-payment of child support, concluding that [he] was lying about being current with his payments." *Id*. "An attorney of ordinary training and skill would have corrected that fallacy." *Id*.

Again, there is nothing in the record before us on direct appeal regarding whether the child support information contained in the PSR is erroneous as claimed by Masters. Further, we cannot discern on the present record whether trial counsel was aware of Masters' alleged agreement regarding missing child support receipts or making a lump-sum payment. Since we cannot determine whether trial counsel was deficient for failing to bring such information to the district court's attention, this claim is preserved for postconviction review.

## VI. CONCLUSION

For the foregoing reasons, we affirm Masters' conviction and the district court's May 16, 2024, sentencing order. The record was sufficient to conclude that Masters' ineffective assistance of trial counsel claim fails regarding counsel not seeking the sentencing judge's recusal. Masters' remaining claims of ineffective assistance of trial counsel cannot be determined on this record and are therefore preserved for postconviction review.

AFFIRMED.

- 12 -